## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| LAWANDA HOLMES, ANI M. MILLER and BRITTANY E. ROXBURY, individually and on behalf of all others similarly situated,<br><br>                       Plaintiffs,<br><br>     v.<br><br>BAPTIST HEALTH SOUTH FLORIDA, INC., THE BOARD OF DIRECTORS OF BAPTIST HEALTH SOUTH FLORIDA, INC., THE RETIREMENT PLAN COMMITTEE OF BAPTIST HEALTH SOUTH FLORIDA, INC. and JOHN DOES 1-30.<br><br>                      Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )    **CIVIL ACTION NO.:** |

## CLASS ACTION COMPLAINT

Plaintiffs, Lawanda Holmes, Ani M. Miller and Brittany E. Roxbury ("Plaintiffs"), by and through their attorneys, on behalf of the Baptist Health South Florida, Inc. 403(b) Employee Retirement Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I.     PLAINTIFFS HAVE EXHAUSTED THEIR ADMINISTRATIVE REMEDIES

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Baptist Health of South Florida, Inc. ("BHSF" or "Company"), the Board of Directors of Baptist Health of South Florida, Inc. and its members during the Class

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Period[2] ("Board") and the Retirement Plan Committee of Baptist Health of South Florida, Inc. and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.        Prior to initiating this action, Plaintiffs exhausted their administrative remedies. *See Lanfear v. Home Depot, Inc.*, 536 F.3d 1217, 1223-25 (11th Cir. 2008).

3.        Defendant Baptist Health provides the following procedure in order to file claims for benefits:

> All claims for benefits under the Plan must be made in writing to the Plan Administrator.  If the Plan Administrator believes that a claim should be denied, the Plan Administrator will notify you in writing of the denial within 90 days after receipt of the claim.  Under special circumstances, the Plan Administrator may extend this 90-day period and in that event, you will be notified of the extension before the end of the initial 90-day period.  If your claim is denied, you will receive a written notice that:
>
> - Sets forth the specific reasons for the denial, making reference to the pertinent provisions of the Plan or Plan documents on which the denial is based;
>
> - Describes any additional material or information that should be received before the claim may be acted upon favorably, and explain why the material or information, if any, is needed; and
>
> - Informs the person making the claim of his right to request review of the decision by the Plan Administrator.

The Baptist Health Enterprises, Inc. 401(k) Employee Retirement Plan Summary Plan Description ("SPD") at 21.

4.        On February 3, 2021, Plaintiffs sent an Administrative Demand to the Plan Administrator via FedEx Priority Overnight.  *See* Exhibit A (administrative demand without exhibits).

---

[2] The Class Period, as will be discussed in more detail below, is defined as February 3, 2015 through the date of judgment.

5.     The Administrative Demand detailed Plaintiffs' claims and enclosed a copy of a Complaint identical to the instant one in all material aspects.

6.     On February 4, 2021, Plaintiffs received confirmation that the Administrative Demand was delivered on that day at 10:15 a.m. and signed for by Edgar Perez. *See* Exhibit B.

7.     Plaintiffs have received no response from either the Plan Administrator or Defendants to the February 3, 2021 Administrative Demand.

8.     Defendants' failure to respond to Plaintiffs February 3, 2021 Administrative Demand within the time prescribed by the SPD deems Plaintiffs' administrative claim exhausted. *See, e.g., Howard v. Union Sec. Ins. Co.*, 2018 WL 11213909, at *2 (N.D. Fla. May 29, 2018) ("when a claimant seeks review of an adverse benefits decision and the administrator does not issue a decision on review within 90 days pursuant to 29 C.F.R. § 2560.503-1—the challenged decision may be 'deemed exhausted,' which will enable the claimant to short circuit the administrative process and go straight to federal court."); *Wilson v. Walgreen Income Protection Plan for Pharmacists and Registered Nurses*, 2015 WL 4528962, at *6 (M.D. Fla. 2015) ( "[t]he 'deemed denied' or 'deemed exhausted' doctrine embodied in Section 2560.503–1(1) provides that if the claim administrator fails to act in the time provided by the plan or the regulations, then the claim is deemed denied by operation of law and the plaintiff is thereafter free to pursue all legal remedies under ERISA without having to further exhaust administrative remedies").

## II.     UTILIZING THE PLAN'S ADMINSITRATIVE REVIEW PROCESS HAS PROVEN FUTILE

9.     Even if Plaintiffs had not exhausted their administrative claims by operation of law, "district courts have discretion to excuse the exhaustion requirement when resort to administrative remedies would be futile or the remedy inadequate." *Lanfear*, 536 F.3d at 1224 (citations omitted); *accord Sanctuary Surgical Centre, Inc., et al.*, 2011 WL 2134534, * 8 (S.D.Fla 2011) (finding Defendants' take on the futility doctrine overly narrow because the "Eleventh Circuit has made

clear that the district court may excuse exhaustion not only when the claimant is denied meaningful access to the administrative review scheme, but also when the available remedy is inadequate or the resort to administrative remedies would be futile.").

10.     First, Plaintiffs have been denied meaningful access to the administrative review scheme because their attempt to exhaust their administrative remedies has been ignored. Second, the thrust of the Complaint is that the Plan fiduciaries failed in their obligation to prudently select and monitor the Plan's investment options resulting in damages to the Plan and its participants. The SPD makes no specific provision to advance such a claim through the administrative process.

### III.   SUMMARY OF CLAIMS

11.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1013 (11th Cir. 2003); *Pledger v. Reliance Trust Co.*, 240 F. Supp. 3d 1314, 1321 (N.D. Ga. 2017).

12.     The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See, "A Look at 401(k) Plan Fees*," *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

13.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and

implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

14.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

15.    Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

16.    Most participants in defined contribution plans like 401(k) or 403(b) plans expect that their accounts will be their principal source of income after retirement.  Although at all times plan accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

17.    Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their retirement plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

18.     At all times during the Class Period, which starts on February 3, 2015,  six years prior to the initiation of the claims exhaustion and process, and is through the date of judgment, the Plan had at least 1 billion dollars in assets under management.  At the end of 2019 and 2018, the Plan had over 1.5 billion dollars and 1.2 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2019 Report of Independent Auditor of the Baptist Health South Florida, Inc. 403(b) Employee Retirement Plan ("2019 Auditor Report") at 3.

19.     The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

20.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's recordkeeping costs.

21.      Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan despite their lower fees.

22.     Because "the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.  Thus, the 'manner that is reasonable and appropriate to the particular investment action,

and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

23.      Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

24.      Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## IV.   JURISDICTION AND VENUE

25.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

26.      This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

27.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## V.  PARTIES

**Plaintiffs**

28.      Plaintiff, Lawanda Holmes ("Holmes"), resides in Homestead, Florida. During her employment, Plaintiff Holmes participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

29.      Plaintiff, Ani M. Miller ("Miller"), resides in Boca Raton, Florida. During her employment, Plaintiff Miller participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

30.      Plaintiff, Brittany E. Roxbury ("Roxbury"), resides in Boynton Beach, Florida. During her employment, Plaintiff Roxbury participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

31.      Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

32.      Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

8

33.     BHSF is the Plan sponsor and a named fiduciary with a principal place of business being 6855 Red Road, Suite 500, Coral Gables, Florida 33143.  The December 31, 2019 Form of BHSF 5500 filed with the United States Department of Labor ("2019 Form 5500") at 1. BHSF is one of South Florida's largest employers. BHSF employs "approximately 23,000 employees and 4,000 physicians … .[4]" BHSF describes itself as "South Florida's world-class healthcare organization." *Id.*

34.     BHSF appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. The Baptist Health South Florida, Inc. 403(b) Employee Retirement Plan as Amended and Restated on January 1, 2020 ("Plan Doc.") at 11. The Plan's Investment Policy Statement further details the Committee's responsibility to "regularly review, monitor and analyze the investment categories and funds offered under the Plans." The Investment Policy Statement of the Baptist Health South Florida, Inc. 403(b) Employee Retirement Plan effective May 2020 ("IPS") at 6. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

35.     In addition to being the Plan sponsor and a named fiduciary, BHSF also makes discretionary decisions each year with regard to contributions to the Plan. As described in the 2019 Auditor Report: "the Employer, at its discretion, may make both a basic and a matching contribution to the Employer contribution account of each participant as defined by the Plan." 2019 Auditor Report at 5.

---

[4] https://baptisthealth.net/en/about-baptist-health

36.     Accordingly, BHSF during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority over management or disposition of Plan.

37.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

38.      BHSF, acting through its Board of Directors, appointed the Committee to, among other things, ensure that the investments available to Plan participants were appropriate, had no more expense than reasonable and performed well as compared to their peers. Plan Doc at 11. The Plan's Investment Policy Statement further details the Committee's responsibility to "regularly review, monitor and analyze the investment categories and funds offered under the Plans." IPS at 6. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

39.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

40.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

41.     A discussed above, BHSF and the Board appointed the Committee to oversee the Plan's investments. The Plan's Investment Policy Statement enumerates the responsibilities of the Committee.

42.     The Committee must evaluate fund performance and the appropriateness of the Plan's fees at least every quarter. IPS at 6. Pursuant to the IPS, the Committee must, among other things, "evaluate each investment fund in terms of the performance compared to relevant market indices and peer groups." *Id.* In addition, the Committee must evaluate the "[r]easonabnleness of fees and costs associated with each investment fund." *Id.* As will be discussed in detail below, the Committee fell well short of these fiduciary goals.

43.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

44.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

45.     To the extent that there are additional officers, employees and/or contractors of BHSF who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, BHSF officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

**VI.   CLASS ACTION ALLEGATIONS**

46.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

>   All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between February 3, 2015 through the date of judgment (the "Class Period").

47.     The members of the Class are so numerous that joinder of all members is impractical.  The 2019 Form 5500 lists 23,548 Plan "participants with account balances as of the end of the plan year."  2019 Form 5500 at 2.

48.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

49.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

>   A.     Whether Defendants are/were fiduciaries of the Plan;
>
>   B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

C.    Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.    The proper form of equitable and injunctive relief; and

E.    The proper measure of monetary relief.

50.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

51.    This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

52.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.    THE PLAN

53.    BHSF established the Plan "to provide employees with a vehicle to accumulate assets on a tax deferred basis as well as to provide discretionary employer contributions." IPS at 3. As will

be discussed below, the Plan has been hindered in fulfilling its purpose by the fiduciary breaches of the Defendants.

54.    As noted above, the Plan is a 403(b) Plan, which serves the same purpose as a 401(k) plan: as a vehicle for retirement savings.

55.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Plan Doc. at 1.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id.*

### *Eligibility*

56.    In general, regular full-time employees are eligible to participate in the Plan. Plan Doc. at 16.

### *Contributions*

57.    There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. 2019 Auditor Report at 5.

58.    With regard to employee contributions: "participants may contribute pre-tax annual compensation, as defined by the Plan, subject to certain Code limitations." 2019 Auditor Report at 5. With regard to matching contributions made by BHSF: "[d]uring 2019, the Employer provided a basic contribution of 3% of annual eligible compensation and matched 50% of up to

the first 4% of annual eligible compensation that a participant contributed to the Plan." *Id.* Participants must complete 90 days of continuous employment before becoming eligible for matching contributions made by BHSF. *Id.*

59.     Like other companies that sponsor 401(k) plans for their employees, BHSF enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

60.     BHSF also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

61.     Given the size of the Plan, BHSF likely enjoyed a significant tax and cost savings from offering a match.

### *Vesting*

62.     With regard to contributions made by participants to the Plan: "[p]articipants are immediately vested in their contributions, plus actual earnings thereon." 2019 Auditor Report at 6. Matching contributions made by BHSF are subject to a 3 year vesting schedule based on years of continuous service. *Id.*

### *The Plan's Investments*

63.     In theory, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance. Plan Doc. at 11. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

64.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

65.     The Plan's assets under management for all funds as of December 31, 2019 was $1,583,569,185.  2019 Auditor Report at 4.

### Payment of Plan Expenses

66.     During the Class Period, administrative expenses were paid for using Plan assets. As described in the 2019 Auditor Report: "[m]anagement fees and operating expenses charged to the Plan for investments in the mutual funds are deducted from income earned on a daily basis … ." 2019 Auditor Report at 7.

## VIII.   THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A.  The Totality of the Circumstances Demonstrates that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

67.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

68.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

69.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-*

*mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

70.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon the numerous factors set forth below.

71.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in *inter alia*, the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

**B.  Defendants Failed to Adequately Monitor the Plan's Recordkeeping Expenses**

72.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

73.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants (*e.g., see* allegations *infra*).  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited January 17, 2021).

74.     In this matter, using revenue sharing to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees.

75.     As demonstrated in the chart below, the Plan's per participant administrative and recordkeeping fees were astronomical when benchmarked against similar plans.

| Year | Participants | Direct Comp to TransAmerica | Indirect Comp to TransAmerica | Total Cost | $PP |
|------|--------------|-----------------------------|-------------------------------|------------|-----|
| 2019 | 23548 | $1,847,178.00 | $1,286,880.00 | $3,134,058.00 | $133.09 |
| 2018 | 20077 | $2,173,656.00 | $999,569.00 | $3,173,225.00 | $158.05 |
| 2017 | 19735 | $1,110,440.00 | $1,039,151.00 | $2,149,591.00 | $108.92 |
| 2016 | 18451 | $1,141,613.00 | $1,073,786.00 | $2,215,399.00 | $120.07 |
| 2015 | 18458 | $1,216,199.00 | $972,355.00 | $2,188,554.00 | $118.57 |

76.     By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.

77.     At all times during the Class Period, the Plan had over 23,000 participants making it eligible for some of the lowest fees on the market.

78.     NEPC, a consulting group, recently conducted its 14th Annual Survey titled the NEPC 2019 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees.[6] The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other. The average plan had $1.1 billion in assets and 12,437 participants. *See* Report at 1.

79.     NEPC's survey found that the majority of plans with over 15,000 participants, to use a conservative number, paid slightly over $40 per participant recordkeeping, trust and custody fees. Report at 10. ***No plan*** with over 15,000 participants paid more than $50 per participant. *Id.*

---

[6] Available at https://www.nepc.com/insights/2019-dc-plan-and-fee-survey.

80.     Another data source, the *401k Averages Book* (20th ed. 2020)[7] studies plan fees for much smaller plans, those under $200 million in assets.  Although it studies much smaller plans than the Plan, it is nonetheless a useful resource because we can extrapolate from the data what a slightly bigger plan like the Plan should be paying for recordkeeping.   That is because recordkeeping and administrative fees should ***decrease*** as a plan increases in size.  For example, a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant.  *401k Averages Book* at p. 95.  A plan with 2,000 participants and $200 million in assets has an average recordkeeping and administration cost (through direct compensation) of $5 per participant.  *Id*., at p. 108.  Thus, the Plan, with over $1.5 billion dollars in assets and over 23,000 participants in 2019, should have had direct recordkeeping costs below the $5 average, which it clearly did not.

81.     The Plan's total recordkeeping costs are clearly unreasonable as some authorities have recognized that reasonable rates for jumbo plans typically average around $35 per participant, with costs coming down every day.[8]

82.     Another way to determine if the Plan is paying costs that are reasonable, is to look at the Total Plan Cost or TPC. The Investment Company Institute ("ICI") conducted a study in 2016 which calculated the average total plan costs from hundreds of 403(b) Plans ranging in size from the smallest plans having less than 1 million dollars in assets all the way up the nation's

---

[7] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information."  *401k Averages Book* at p. 2.

[8] Case law is in accord that large plans can bargain for low recordkeeping fees.  *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

largest plans with assets under management of more than 1 billion dollars. *See, ICI* Study at 44. Looking at Plans that have over 1 billion dollars, the ICI determined that the average total plan cost or TPC for 403(b) Plans with over 1 billion dollars in assets under management is .39% of total plan assets. Here, the Plan had a TPC of more than .60% or, in other words, more than 53% higher than the average.

83.     In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

84.     Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015); *see also* NEPC 2019 Defined Contribution Progress Report at 10 ("Best Practice is to compare fees and services through a record keeping vendor search Request for Proposal process).

85.     The fact that the Plan has stayed with the same recordkeeper over the course of the Class Period, and paid the same relative amount in recordkeeping fees, there is little to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time prior to 2015 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

86.     Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

### C. Many of the Plan's Funds had Investment Management Fees in Excess of Fees for Funds in Similarly-Sized Plans

87.      Another indication of Defendants' failure to prudently monitor the Plan's funds is that several funds during the Class Period were more expensive than comparable funds found in similarly sized plans (conservatively, plans having over 1 billion dollars in assets).

88.     In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans.  This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [9]

89.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having

---

[9] *See* *https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf* ("DOL 408(b)(2) Regulation Fact Sheet")

this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

90.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services.  Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers."  DOL 408(b)(2) Regulation Fact Sheet.

91.     Investment options have a fee for investment management and other services.  With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

92.      "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage."  "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[10]

93.     For purposes of evaluating expense ratios of an investment, plan fiduciaries should obtain competitive pricing information (*i.e.*, fees charged by other comparable investment funds to similarly situated plans).  This type of information can be obtained through mutual fund data

---

[10] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

services, such as Morningstar, or with the assistance of the plan's expert consultant.  However, for comparator information to be relevant for fiduciary purposes, it must be consistent with the size of the plan and its relative bargaining power.  Jumbo plans for instance are able to qualify for lower fees on a per participant basis, and comparators should reflect this fact.

94.     According to Vanguard, "[b]enchmarking is one of the most widely used supplements to fee disclosure reports and can help plan sponsors put into context the information contained in the reports."  "Best Practices for Plan Fiduciaries," at 37.

95.     "The use of third-party studies provides a cost-effective way to compare plan fees with the marketplace. Plan sponsors may elect to engage a consultant to assist in the benchmarking process.  For a fee, consultants can give plan sponsors a third-party perspective on quality and costs of services.  It is important to understand the plan (*e.g.,* plan design, active or passive investment management, payroll complexities, etc.) as it relates to the benchmarking information in order to put the results in an appropriate context.  By understanding all of the fees and services, a plan sponsor can make an accurate 'apples-to-apples' comparison." *Id.*

96.     Here, the Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees.

97.     In some cases, expense ratios for the Plan's funds were ***343%*** above the ICI Median (in the case of T. Rowe Price Retirement 2045) and ***110%*** above the ICI Median (in the case of JPMorgan Small Cap Value I) in the same category.  The high cost of the Plan's funds is also evident when comparing the Plan's funds to the average fees of funds in similarly-sized plans.  These excessively high expense ratios are detailed in the charts below:

| ICI Median Chart | | | |
| --- | --- | --- | --- |
| **Current Fund** | **2020 Exp Ratio** | **Investment Style** | **ICI Median[11]** |
| Wells Fargo Growth Inst | 0.75 % | Domestic Equity | 0.47% |
| PIMCO Total Return Instl | 0.71 % | Domestic Bond | 0.37% |
| LSV Value Equity | 0.65 % | Domestic Equity | 0.47% |
| T. Rowe Price Retirement 2040 | 0.70 % | Target Date | 0.16% |
| T. Rowe Price Retirement 2045 | 0.71 % | Target Date | 0.16% |
| T. Rowe Price Retirement 2030 | 0.65 % | Target Date | 0.16% |
| T. Rowe Price Retirement 2035 | 0.68 % | Target Date | 0.16% |
| Invesco Oppenheimer International Gr R6 | 0.69 % | International Equity | 0.48% |
| T. Rowe Price Retirement 2050 | 0.71 % | Target Date | 0.16% |
| T. Rowe Price Retirement 2020 | 0.58 % | Target Date | 0.16% |
| T. Rowe Price Retirement 2025 | 0.62 % | Target Date | 0.16% |
| JPMorgan Small Cap Value I | 0.99 % | Domestic Equity | 0.47% |
| T. Rowe Price Retirement 2055 | 0.71 % | Target Date | 0.16% |
| ClearBridge Small Cap Growth IS | 0.78 % | Domestic Equity | 0.47% |
| Neuberger Berman Sustainable Eq Instl | 0.68 % | Domestic Equity | 0.47% |
| T. Rowe Price Retirement 2010 | 0.52 % | Target Date | 0.16% |
| T. Rowe Price Retirement 2015 | 0.55 % | Target Date | 0.16% |
| PIMCO Low Duration Instl | 0.71 % | Domestic Bond | 0.37% |
| T. Rowe Price Retirement Balanced | 0.50 % | Target Date | 0.16% |
| T. Rowe Price Retirement 2005 | 0.52 % | Target Date | 0.16% |
| BrandywineGLOBAL Global Opp Bond I | 0.68 % | International Bond | 0.61% |

---

[11] These Medians and Averages are taken from the BrightScope/ICI Defined Contribution Plan Profile: A Close Look at ERISA 403(b) Plans, 2016 ("ICI Study") at 55 and 47, respectfully, available at https://www.ici.org/pdf/20_ppr_dcplan_profile_403b.pdf

98.     The high cost of the Plan's funds is even more stark when comparing the Plan's funds to the average fees of funds in similarly-sized plans:

| ICI Average Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 Exp Ratio** | **Investment Style** | **ICI Average[11]** |
| Wells Fargo Growth Inst | 0.75 % | Domestic Equity | 0.39% |
| PIMCO Total Return Instl | 0.71 % | Domestic Bond | 0.29% |
| LSV Value Equity | 0.65 % | Domestic Equity | 0.39% |
| T. Rowe Price Retirement 2040 | 0.70 % | Target Date | 0.36% |
| T. Rowe Price Retirement 2045 | 0.71 % | Target Date | 0.36% |
| T. Rowe Price Retirement 2030 | 0.65 % | Target Date | 0.36% |
| T. Rowe Price Retirement 2035 | 0.68 % | Target Date | 0.36% |
| Invesco Oppenheimer International Gr R6 | 0.69 % | International Equity | 0.49% |
| T. Rowe Price Retirement 2050 | 0.71 % | Target Date | 0.36% |
| T. Rowe Price Retirement 2020 | 0.58 % | Target Date | 0.36% |
| T. Rowe Price Retirement 2025 | 0.62 % | Target Date | 0.36% |
| JPMorgan Small Cap Value I | 0.99 % | Domestic Equity | 0.39% |
| T. Rowe Price Retirement 2055 | 0.71 % | Target Date | 0.36% |
| ClearBridge Small Cap Growth IS | 0.78 % | Domestic Equity | 0.39% |
| Neuberger Berman Sustainable Eq Instl | 0.68 % | Domestic Equity | 0.39% |
| T. Rowe Price Retirement 2010 | 0.52 % | Target Date | 0.36% |
| T. Rowe Price Retirement 2015 | 0.55 % | Target Date | 0.36% |
| PIMCO Low Duration Instl | 0.71 % | Domestic Bond | 0.29% |
| T. Rowe Price Retirement Balanced | 0.50 % | Target Date | 0.36% |
| T. Rowe Price Retirement 2005 | 0.52 % | Target Date | 0.36% |
| BrandywineGLOBAL Global Opp Bond I | 0.68 % | International Bond | 0.61% |

99.     Given the excessive costs of the above funds they should have been replaced during the Class Period.

### D. Several of the Plan's Funds With Substantial Assets Were Not in the Lowest Fee Share Class Available to the Plan

100.    Another fiduciary breach stemming from Defendants' flawed investment monitoring system resulted in the failure to identify available lower-cost share classes of many of the funds in the Plan during the Class Period.

101.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager. Because the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

102.    Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets. Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds. However, it is common knowledge that investment minimums are often waived for jumbo plans like the Plan. *See, e.g., Davis et al. v. Washington Univ. et al.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).

103.    The total assets under management for all of these funds was over 781 million dollars thus easily qualifying them for lower share classes. The following chart provides detail on these funds:

| Fund in the Plan | ER | Less Expensive Share Class | Less Expensive ER | Excess Cost |
|---|---|---|---|---|
| TRRDX<br>T. Rowe Price Retirement 2040 | 0.70 % | TRPDX<br>T. Rowe Price Retirement I 2040 I | 0.51% | 37% |
| TRRKX<br>T. Rowe Price Retirement 2045 | 0.71 % | TRPKX<br>T. Rowe Price Retirement I 2045 I | 0.52% | 37% |
| TRRCX<br>T. Rowe Price Retirement 2030 | 0.65 % | TRPCX<br>T. Rowe Price Retirement I 2030 I | 0.49% | 33% |
| TRRJX<br>T. Rowe Price Retirement 2035 | 0.68 % | TRPJX<br>T. Rowe Price Retirement I 2035 I | 0.50% | 36% |
| TRRMX<br>T. Rowe Price Retirement 2050 | 0.71 % | TRPMX<br>T. Rowe Price Retirement I 2050 I | 0.52% | 37% |
| TRRBX<br>T. Rowe Price Retirement 2020 | 0.58 % | TRBRX<br>T. Rowe Price Retirement I 2020 I | 0.43% | 35% |
| TRRHX<br>T. Rowe Price Retirement 2025 | 0.62 % | TRPHX T. Rowe Price Retirement I 2025 I | 0.47% | 32% |
| TRRNX<br>T. Rowe Price Retirement 2055 | 0.71 % | TRPNX T. Rowe Price Retirement I 2055 I | 0.52% | 37% |
| TRRAX<br>T. Rowe Price Retirement 2010 | 0.52 % | TRPAX<br>T. Rowe Price Retirement I 2010 I | 0.37% | 41% |
| TRRGX<br>T. Rowe Price Retirement 2015 | 0.55 % | TRFGX<br>T. Rowe Price Retirement I 2015 I | 0.40% | 38% |
| TRRFX<br>T. Rowe Price Retirement 2005 | 0.52 % | TRPFX<br>T. Rowe Price Retirement I 2005 I | 0.37% | 41% |
| SGRNX<br>Wells Fargo Growth Inst | 0.75 % | SGRHX<br>Wells Fargo Growth R6 | 0.70% | 7% |
| PSOPX<br>JPMorgan Small Cap Value I | 0.99 % | JSVUX<br>JPMorgan Small Cap Value R6 | 0.76% | 30% |

| Fund in the Plan | ER | Less Expensive Share Class | Less Expensive ER | Excess Cost |
|---|---|---|---|---|
| NBSLX<br>Neuberger Berman Sustainable Eq Instl | 0.68 % | NRSRX<br>Neuberger Berman Sustainable Eq R6 | 0.59% | 15% |
| PTLDX<br>PIMCO Low Duration Instl | 0.71 % | PLDDX<br>Pacific Funds Diversified Income Advisor | 0.45% | 58% |
| TRRIX<br>T. Rowe Price Retirement Balanced | 0.50 % | TRPTX<br>T. Rowe Balanced I | 0.35% | 43% |

104.    At all times during the Class Period, Defendants knew or should have known of the existence of identical less expensive share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

105.    There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  Because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds ***could not have*** (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility.  In short, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

106.    Defendants made investments with higher costs (higher expense ratios) available to participants while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received.  This reduces the likelihood that participants achieve their preferred lifestyle in retirement.

107.    Simply put, a fiduciary to a jumbo defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.

108.    Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

109.    Here, had the Plan's fiduciaries prudently undertaken their fiduciary responsibility for determining the appropriateness of the Plan's investment offerings and monitoring investment performance, the Plan would have moved to the identical lower cost share class of the identical fund. Plan Doc. at 71.

### E. Several of the Funds in the Plan had Lower Cost Better Performing Alternatives in the Same Investment Style

110.    The Plan failed to replace several of the higher cost and underperforming funds which in 2019 housed over 955 million dollars in participant assets. These funds had nearly identical lower cost alternatives during the Class Period. These funds are what's known as actively managed funds. As detailed in a well-respected investment journal: "[a]n actively managed investment fund is a fund in which a manager or a management team makes decisions about how to invest the fund's money.[12]" Thus, the success or failure of an actively managed fund is linked directly to the abilities of the managers involved.

111.    Here, the performance of the managers of these funds fell well short of acceptable industry standards and they should have been replaced at the beginning of the Class Period or

---

[12] https://www.thebalance.com/actively-vs-passively-managed-funds-453773 last accessed on November 12, 2020.

sooner. Failure to do so, cost the Plan and its participants millions of dollars in lost opportunity and revenue.

112.    There were, at least, hundreds of superior performing less expensive alternatives available during the Class Period one of which should have been selected by the Plan.

113.    The chart below choses one of these superior performing alternatives out of the hundreds available for each fund and compares them to the underperforming funds currently in the Plan:

| Current Fund | 2020 ER | Active Lower Cost Alternative | 2020 ER | % Fee Excess |
|---|---|---|---|---|
| SGRNX<br>Wells Fargo Growth Inst | 0.75 % | VWUAX<br>Vanguard U.S. Growth Fund Admiral Shares | 0.28 % | 168% |
| PTTRX<br>PIMCO Total Return Instl | 0.71 % | SCCIX<br>Carillon Reams Core Bond I | 0.40 % | 78% |
| LSVEX<br>LSV Value Equity | 0.65 % | VEIRX<br>Vanguard Equity-Income Adm | 0.18 % | 261% |
| OIGIX<br>Invesco Oppenheimer International Gr R6 | 0.69 % | VWILX<br>Vanguard International Growth Adm | 0.32 % | 116% |
| PSOPX<br>JPMorgan Small Cap Value I | 0.99 % | FRCSX<br>Franklin Small Cap Value R6 | 0.63 % | 57% |
| LMOIX<br>ClearBridge Small Cap Growth IS | 0.78 % | LADVX<br>Lord Abbett Developing Growth R6 | 0.60 % | 30% |
| NBSLX<br>Neuberger Berman Sustainable Eq Instl | 0.68 % | VHCAX<br>Vanguard Capital Opportunity Adm | 0.37 % | 84% |
| PTLDX<br>PIMCO Low Duration Instl | 0.71 % | JSDRX<br>JPMorgan Short Duration Core Plus R6 | 0.33 % | 115% |

| Current Fund | 2020 ER | Active Lower Cost Alternative | 2020 ER | % Fee Excess |
|---|---|---|---|---|
| TRRIX<br>T. Rowe Price Retirement Balanced | 0.50 % | VSCGX<br>Vanguard LifeStrategy Cnsrv Gr Inv | 0.12 % | 317% |
| GOBIX<br>BrandywineGLOBAL Global Opp Bond I | 0.68 % | DODLX<br>Dodge & Cox Global Bond | 0.45 % | 51% |
| TRRDX<br>T. Rowe Price Retirement 2040 | 0.70 % | RFGTX<br>American Funds 2040 Trgt Date Retire R6 | 0.38 % | 84% |
| TRRKX<br>T. Rowe Price Retirement 2045 | 0.71 % | RFHTX<br>American Funds 2045 Trgt Date Retire R6 | 0.38 % | 87% |
| TRRCX<br>T. Rowe Price Retirement 2030 | 0.65 % | RFETX<br>American Funds 2030 Trgt Date Retire R6 | 0.35 % | 86% |
| TRRJX<br>T. Rowe Price Retirement 2035 | 0.68 % | RFFTX<br>American Funds 2035 Trgt Date Retire R6 | 0.37 % | 84% |
| TRRMX<br>T. Rowe Price Retirement 2050 | 0.71 % | RFITX<br>American Funds 2050 Trgt Date Retire R6 | 0.39 % | 82% |
| TRRNX<br>T. Rowe Price Retirement 2055 | 0.71 % | RFKTX<br>American Funds 2055 Trgt Date Retire R6 | 0.40 % | 78% |
| TRRAX<br>T. Rowe Price Retirement 2010 | 0.52 % | RFTTX<br>American Funds 2010 Trgt Date Retire R6 | 0.31 % | 68% |

114.    Not only are the fees excessive as compared to the similar lower cost alternatives discussed above but the suggested alternative funds outperformed all of the funds significantly. The difference between the excessive fees paid for these underperforming funds and the suggested alternatives represent more lost savings each year for plan participants and have been compounded over the years.  The underperformance of these funds as compared to the suggested alternatives increases these damages exponentially. The underperformance of these funds is represented in the chart below:

| Fund | Benchmark | Lower Cost Alternative | Benchmark Relative | | |
|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y |
| T. Rowe Price Retirement 2040 | Vanguard Target Retirement 2040 Inv | American Funds 2040 Target Date Retire R6 | 0.51 % | 0.25 % | 0.45 % |
| | | | 4.11 % | 1.78 % | 1.37 % |
| T. Rowe Price Retirement 2045 | Vanguard Target Retirement 2045 Inv | American Funds 2045 Target Date Retire R6 | 0.45 % | 0.27 % | 0.41 % |
| | | | 4.03 % | 1.86 % | 1.39 % |
| T. Rowe Price Retirement 2030 | Vanguard Target Retirement 2030 Inv | American Funds 2030 Target Date Retire R6 | 0.31 % | 0.09 % | 0.61 % |
| | | | 2.38 % | 0.89 % | 0.89 % |
| T. Rowe Price Retirement 2035 | Vanguard Target Retirement 2035 Inv | American Funds 2035 Target Date Retire R6 | 0.42 % | 0.16 % | 0.55 % |
| | | | 3.75 % | 1.59 % | 1.46 % |
| T. Rowe Price Retirement 2050 | Vanguard Target Retirement 2050 Inv | American Funds 2050 Target Date Retire R6 | 0.39 % | 0.26 % | 0.40 % |
| | | | 4.37 % | 2.02 % | 1.52 % |
| T. Rowe Price Retirement 2025 | Vanguard Target Retirement 2025 Inv | American Funds 2025 Target Date Retire R6 | 0.27 % | -0.03 % | 0.54 % |
| | | | 0.05 % | -0.24% | -0.18% |
| T. Rowe Price Retirement 2055 | Vanguard Target Retirement 2050 Inv | American Funds 2055 Target Date Retire R6 | 0.24 % | 0.19 % | 0.35 % |

| Fund | Benchmark | Lower Cost Alternative | Benchmark Relative | | |
|---|---|---|---|---|---|
| | | | **1Y** | **3Y** | **5Y** |
| | | | 4.30 % | 1.98 % | 1.50 % |
| T. Rowe Price Retirement 2010 | Vanguard Target Retirement 2010 Inv | American Funds 2010 Target Date Retire R6 | - | - | 4.80 % |
| | | | - | - | 5.35 % |
| LSV Value Equity | iShares Russell 1000 Value ETF | Vanguard Equity-Income Adm | -5.10% | -4.51% | -2.49% |
| | | | 2.41% | 2.18% | 1.97% |
| Invesco Oppenheimer International Gr R6 | iShares MSCI EAFE Growth ETF | Vanguard International Growth Adm | 6.82% | -1.92% | -1.02% |
| | | | 36.35% | 9.31% | 9.68% |
| JPMorgan Small Cap Value I | iShares Russell 2000 Value ETF | Franklin Small Cap Value R6 | 0.24% | -0.80% | -1.64% |
| | | | 4.95% | 4.58% | 2.64% |
| ClearBridge Small Cap Growth IS | Vanguard Small-Cap Growth ETF | Lord Abbett Developing Growth R6 | 8.47% | 5.33% | 3.70% |
| | | | 27.16% | 13.99% | 5.18% |
| Neuberger Berman Sustainable Eq Instl | iShares Russell 1000 Growth ETF | Vanguard Growth Index Institutional | -26.28% | -12.59% | -8.75% |
| | | | 1.07% | -0.41% | -0.64% |
| PIMCO Low Duration Instl | Vanguard Short-Term Bond ETF | JPMorgan Short Duration Core Plus R6 | -1.72% | -0.83% | -0.10% |

| Fund | Benchmark | Lower Cost Alternative | Benchmark Relative | | |
|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y |
| | | | -0.62% | 0.00% | 2.17% |
| | | | | | |
| T. Rowe Price Retirement Balanced | 40% SPY, 60% AGG Composite | Vanguard LifeStrategy Cnsrv Gr Inv | 15.31% | 10.45% | 6.45% |
| | | | 15.48% | 11.19% | 6.80% |

115.    One of the funds in the Plan, discussed above, performed worse than most of its peers. As of the third quarter of 2020, the LSV Value Equity fund was worse than 94% of its 1,176 peers at the three year mark, 87% worse than 1,113 of its peers at the 5 year mark.

116.    As detailed in the chart above, the comparator funds in the chart easily outperformed the funds in the Plan at the 1, 3  and 5 year marks. A prudent fiduciary should have been aware of these better preforming lower cost alternative and switched to them at the beginning of the Class Period.  Failure to do so is a clear indication that the Plan lacked any prudent process whatsoever for monitoring the cost and performance of the funds in the Plan.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against the Committee)**

117.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

118.    At all relevant times, the Committee and its members during the Class Period ("Prudence/Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

119.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the

assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

120.    The Prudence/Loyalty Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants. Instead, the Prudence/Loyalty Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence/Loyalty Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.

121.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

122.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence/Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

123.    The Prudence/Loyalty Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the

circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches

of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against BHSF and the Board Defendants)**

124.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this

Complaint as if fully set forth herein.

125.    BHSF and the Board (the "Monitoring Defendants") had the authority to appoint

and remove members of the Committee, and the duty to monitor the Committee and were aware

that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

126.    In light of this authority, the Monitoring Defendants had a duty to monitor the

Committee Defendants to ensure that the Committee Defendants were adequately performing their

fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that

the Committee Defendants were not fulfilling those duties.

127.    The Monitoring Defendants also had a duty to ensure that the Committee

Defendants possessed the needed qualifications and experience to carry out their duties; had

adequate financial resources and information; maintained adequate records of the information on

which they based their decisions and analysis with respect to the Plan's investments; and reported

regularly to the Monitoring Defendants.

128.    The Monitoring Defendants breached their fiduciary monitoring duties by, among

other things:

> (a)    Failing to monitor and evaluate the performance of the Committee Defendants
>
> or have a system in place for doing so, standing idly by as the Plan suffered
>
> significant losses as a result of the Committee Defendants' imprudent actions
>
> and omissions;

(b)     failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes; and

(c)     failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

129.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

130.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.


Date: August 17, 2021                    **MATTHEW FORNARO, P.A.**

                                         */s/ Mathew Fornaro*
                                         Matthew Fornaro, Esq.
                                         FL ID #650641
                                         Matthew Fornaro P.A.
                                         11555 Heron Bay Boulevard
                                         Suite 200
                                         Coral Springs, FL  33076
                                         954-324-3651
                                         954-248-2099 Fax
                                         mfornaro@fornarolegal.com

                                         **CAPOZZI ADLER, P.C.**

                                         */s/ Donald R. Reavey*
                                         Donald R. Reavey, Esquire
                                         PA Attorney ID #82498
                                         (*Pro Hac Admission to be Requested*)
                                         2933 North Front Street
                                         Harrisburg, PA 17110
                                         donr@capozziadler.com
                                         (717) 233-4101
                                         Fax (717) 233-4103

                                         */s/ Mark K. Gyandoh*
                                         Mark K. Gyandoh, Esquire
                                         PA Attorney ID # 88587
                                         (*Pro Hac Admission to be Requested*)
                                         Gabrielle Kelerchian, Esquire
                                         (*Pro Hac Admission to be Requested*)
                                         **CAPOZZI ADLER, P.C.**
                                         312 Old Lancaster Road
                                         Merion Station, PA 19066
                                         markg@capozziadler.com
                                         gabriellek@capozziadler.com
                                         (610) 890-0200
                                         Fax (717) 233-4103

                                         Counsel for Plaintiffs and the Putative Class